**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **HORVATH TOWERS III, LLC,** | : | |
| **Plaintiff** | : | **CIVIL ACTION NO. 3:16-0029** |
| **v.** | : | **(JUDGE MANNION)** |
| **ZONING HEARING BOARD OF BUTLER TOWNSHIP,** | : | |
| **Defendant.** | : | |

**MEMORANDUM**

Currently before the court is a motion for summary judgment filed by the defendant, the Zoning Hearing Board of Butler Township ("the Board"), (Doc. 14), and a cross-motion for summary judgment filed by plaintiff Horvath Towers III, LLC ("Horvath"), (Doc. 19). Based on the foregoing reasons, the Board's motion is **GRANTED** and Horvath's motion is **DENIED**.

## I. BACKGROUND[1]

### A. Horvath's Zoning Application

Horvath is in the business of leasing real estate, on which it constructs radio towers and then sublets the use of those towers to personal wireless

[1] Unless otherwise noted, the primary facts are taken from uncontested portions of Horvath's statement of facts, (Doc. 20), and the Board's statement of facts, (Doc. 16). Horvath did not respond to the Board's statement of facts per Local Rule 56.1. Thus, in accordance with the rule, the material facts set forth in the Board's statement are deemed admitted. The court will also refer to the Return of Record submitted by the Board, (Doc. 18), containing all of the documents and exhibits from the underlying zoning application.

communications providers licensed by the Federal Communications Commission ("FCC"). (Doc. 20 ¶1; Doc. 25 ¶1). The Board is a government agency created by the Township of Butler, Schuylkill County, Pennsylvania pursuant to Section 10901 of the Pennsylvania Municipalities Planning Code, 53 PA. STAT. §10101–11202. (*Id*. ¶2; *id*. ¶2). On August 24, 2015, Horvath entered into a land lease agreement with Ettore DiCasimmiro, executor of the estate of Eileen J. DiCasimmiro, together with Ettore DiCasimmiro, Felicia Bruni, and Bernard DiCasimmiro. (Doc. 20 ¶3). The DiCasimmiro property is located in the R-1 Low Density Residential Zoning District ("R-1 District") within Butler Township. (*Id*. ¶14). Horvath intended to use the leased land to build a tower which it would then sublease to Limitless Wireless ("Limitless"), a wireless telephone and high speed data internet provider. (*Id*. ¶¶5, 7). There is a tower owned and/or operated by Service Electric in the area of the DiCasimmiro property. (*Id*. ¶34; Doc. 25 ¶24). The tower is not located in the R-1 District and the record does not indicate when that tower was constructed. (Doc. 25 ¶34).

On June 12, 2015, Horvath and Limitless submitted a building and zoning permit application to the Butler Township Zoning Officer, which was denied.[2] (Doc. 16 ¶1). Horvath appealed the denial to the Board and

---

[2] Horvath Communications, Inc., and not Horvath Towers III, LLC, was listed as the applicant for the zoning permit. (Doc. 16 ¶1). There is no genuine dispute that the applicant and the current plaintiff are different entities and it appears there was a naming error on the application or, perhaps, a fictitious

requested a special exception under Section 509 of the Butler Township Zoning Ordinance of 1997 to erect a cell tower in the R-1 District. (*Id*. ¶2). The tower was to consist of a 195-foot monopole-type tower with proposed Limitless antennas and a four foot lighting rod on top, bringing the total height for the proposed tower to 199 feet. (Doc. 20 ¶10).

### B. The Township Ordinance

Section 509 was added to Butler Township Zoning Ordinance of 1997 ("Ordinance") on March 26, 2010 by Ordinance No. 2010-9. (Doc. 18-2 at 20). This section was added under Article V of the Ordinance titled "Supplementary Regulations." Section 509 is titled "Uses Not Specified" and it states as follows:

> Any Use not specifically mentioned in Article IV or elsewhere in the Butler Township Zoning Ordinance of 1997 or any amendments thereto shall be allowed by Special Exception in the district or districts where, and to the extent that, similar uses are Permitted Uses or are allowed by Accessory Use, Conditional Use or Special Exception; provided that said Use does not constitute a public or private nuisance, and provided that said Use will be subject to any reasonable restrictions to protect the public health, safety and general welfare determined to be necessary by the Butler Township Zoning Hearing Board. If the Use not specifically mentioned is dissimilar to all Uses which are Permitted Uses or are allowed by Accessory Use,

---

name was used. The Board has not raised this as an issue for resolution. Thus, the court will continue to refer to the plaintiff Horvath as the applicant listed on the permit application.

> Conditional Use or Special Exception, then such Use shall be allowed by Special Exception in the Light Industrial District (§408): provided that said Use does not constitute a public or private nuisance, and provided that said Use will be subject to any reasonable restrictions to protect the public health, safety and general welfare determined to be necessary by the Butler Township Zoning Hearing Board.

(*Id*.). Section 803.3 of the Ordinance is also applicable to Section 509 because Section 509 qualifies as a special exception. Section 803.3 provides a list of seven conditions applicable to the Board's grant of any special exceptions under the Ordinance. One requirement is that "[s]uch use shall not adversely affect the character of the zoning district, nor the conservation of property values, nor the health and safety of residents or worker on adjacent properties and in the general neighborhood." (Doc. 22-2 §803.3(e)).

Section 403 of the Ordinance lists the items that are allowed within the R-1 District specifically, the district Horvath proposed to build a tower. (Doc. 18-2 at 17–19). Section 403 does not explicitly allow wireless communication facilities in the R-1 District. Section 403.1(d) does, however, allow for "[p]ublic uses, structures and buildings owned or operated by the Municipality or any Municipal Authority organized by the Municipality" as a permitted use. (*Id*. at 17). Horvath's application was submitted pursuant to Section 509 under the theory that Horvath's tower might qualify as a special exception because it was similar to the permitted use listed in Section 403.1(d).

### C. The Board Hearings

A public hearing was conducted on July 29,[3] August 26, and October 14, 2015 regarding Horvath's request for a special exception and evidence was presented to the Board in the form of oral testimony and exhibits. (Doc. 16 ¶7). During these hearings, four individuals testified on Horvath's behalf: (1) James Shelton, a Limitless radiofrequency engineer; (2) Jeffrey Nahorny, P.E., a professional engineer; (3) John Doyle, M.A.I., a real estate appraiser; and (4) Deborah Baker, a site acquisition consultant. (Doc. 20 ¶24; Doc. 25 ¶24). Several residents also testified at the hearings and objected to the application ("objectors"). In addition, Edward Barket, a real estate appraiser, offered testimony on behalf of the objectors. (*Id*.; *id*.).

There was testimony regarding the need for a tower in order to provide radiofrequency coverage. (Doc. 16 ¶9). Mr. Shelton and Ms. Baker also testified that the proposed tower would be similar to municipality-owned towers in other counties. (Doc. 18-7 at 29, 73). Horvath also provided eighteen examples of municipality owned or operated wireless communication facilities within the Commonwealth of Pennsylvania, submitted as Applicant's Exhibit 8. (Doc. 16 ¶10; *see also* Doc. 18-3 at 23; Doc. 18-8 at 24–25). None of these facilities were located in Schuylkill County. (*Id*.). All of the facilities were

---

[3] The transcript for the first hearing is dated June 29, 2016. (Doc. 18-7 at 1). All parties agree that this date is incorrect and that the correct date is July 29, 2015.

located in Dauphin and Lancaster County, with the exception of one facility located in Berks County. In addition, no party could identify a town within Schuylkill County that owned its own tower. (*See* Doc. 18-7 at 74; Doc. 18-8 at 29).

In addition to the above testimony regarding municipality-owned towers, Horvath and the objectors put on evidence regarding the impact of the proposed tower on the community. Horvath put on evidence to show that the proposed tower would meet the seven requirements of Section 803.3 for all special exceptions. (*See* Doc. 20 ¶32). Mr. Doyle presented a written report utilizing the paired analysis methodology as evidence to show that the proposed tower would not adversely impact the market value of homes in the community. (*See id*. ¶32(c); Doc. 18-3 at 76–122; Doc. 18-4). Unlike Mr. Doyle, Mr. Barket, the real estate appraiser who testified on behalf of the objectors, did not prepare a written report and did not conduct a particular study in reaching his opinion that the proposed tower would adversely effect the market value of homes. (*See id*. at 33).

At the conclusion of the hearing, Horvath and the objectors submitted findings of fact and conclusions of law for consideration by the Board. (Doc. 20 ¶25). Ultimately, the Board denied Horvath's request for a special exception in a written decision dated December 9, 2015. (*Id*. ¶26; *see also* Doc. 22-6).

**D. The Board's Decision**

The Board made several conclusions of fact and law to support their decision to deny Horvath's application for a special exception under Section 509. First, in its conclusions of law, the Board found that Horvath's "proposed use [was] not similar or sufficiently similar to uses, building [sic] or structures of Butler Township" as required by Section 509. (Doc. 22-6 ¶13). In making this finding the Board stated:

> While there may be municipally owned or operated facilities which are similar to privately owned or operated wireless facilities in terms of their design, structures and operation, including towers used for emergency or governmental communication purposes, elsewhere in Pennsylvania, none are known to exist or needed in Schuylkill County nor specifically in Butler Township as the record lacked such evidence; moreover, the record lacks evidence of many key issues about these other wireless communication towers for municipal or public use located elsewhere including as to when any such public or emergency (911) communication towers where erected vis-á-vis any surrounding residential structures nearby, the actual distances from the towers to the residential structures, what the corresponding zoning regulations allowed and what similar zoning districts they were erected in the respective locations, and the height of the other structures as none appear from the photographic images submitted as part of Applicant Exhibit 8 to be as large or high as the Applicant's proposed cell tower. There was no testimony that there are plans for any wireless communication towers to be utilized by the township for police or other municipal uses.

(*Id*. ¶11). The Board did not give any weight to Applicant's Exhibit 8. (*Id*.). Instead of finding that the proposed tower was similar or substantially similar to any uses allowed in the R-1 District, the Board found that the proposed use might be permitted in Light Industrial District. (*Id*. ¶¶14–15).

Next, the Board concluded that "[e]ven if the Applicant [were] able to carry its burden for a special exception in R-1, the Applicant [had] not adequately met its burden set forth set forth in Section 803.3 [of the Ordinance] for special exceptions." (*Id*. ¶17). In reaching this secondary conclusion, the Board explained that Horvath had not demonstrated compliance with the criteria in Section 803.3. (*Id*.). The Board found that (1) the proposed tower would adversely affect the character of the neighborhood and the conservation of property values by deteriorating property values and their marketability; (2) that no adequate safeguards could be implemented to mitigate this impact; (3) that the tower was not in harmony with the general purpose and intent of the Ordinance and would not promote the most appropriate use of the land; (4) that it would be an attractive nuisance to children; (5) that is might create traffic of construction equipment during erection; and (6) that it would conflict with the direction of building development. (*Id*.). The Board then stated that the resident objectors had "met their respective burden of demonstrating the negative impact on the health, safety and welfare presented by the project, which the Applicant [had] failed

to adequately rebut." (*Id*. ¶19). It is this secondary finding that Horvath now challenges, while the Board stands upon the first.

## II. PROCEDURAL HISTORY

On January 7, 2016, Horvath filed a complaint in this court alleging that the Board's decision violated two separate provisions of the Telecommunications Act of 1996 ("TCA"), PUB. L. NO. 104-104, 110 STAT. 56 (codified in scattered sections of 15 and 47 U.S.C.). (*See* Doc. 1). Horvath also appealed the Board's decision on state law grounds. (*See id*.). On January 8, 2016, Horvath also filed a Notice of Land Use Appeal in the Court of Common Pleas of Schuylkill County. (Doc. 16 ¶19). On March 15, 2016, the state land use appeal was stayed at the request of the parties until final disposition of the action filed in this court. (*Id*. ¶21).

On June 24, 2016, the Board filed their current motion for summary judgment, along with a statement of facts, exhibits, and a brief in support. (Docs. 14, 15, 16). On June 27, 2016, the Board also filed a Return of Record documenting the entirety of the underlying zoning proceedings. (Doc. 18). On June 27, 2016, Horvath filed the current cross-motion for summary judgment, along with a statement of facts and brief in support. (Docs. 19, 20, 21). On June 28, 2016, Horvath filed its own set of exhibits. (Doc. 22). On July 18, 2016, the Board responded to Horvath's cross-motion with a brief in opposition and a response to Horvath's statement of facts. (Docs. 24–25). Also on July

18, 2016, Horvath responded to the Board's motion with a brief in opposition. (Doc. 23). Horvath did not file a response to the Board's statement of facts.

## III. STANDARD OF REVIEW

Rule 56 allows a court to enter summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also* *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). A factual dispute is material if it will affect the outcome of the case and is genuine if a reasonable jury could find for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Aetna Cas. & Sur. Co. v. Ericksen*, 903 F. Supp. 836, 838 (M.D. Pa. 1995). With respect to materiality, "the substantive law will identify which facts are material." *Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 172 (3d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248)). "Factual disputes that are irrelevant and unnecessary will not be counted." *Id.*

In order to prevail, the movant and nonmovant must point to "particular parts of materials in the record" and show that the other party's evidence does "not establish the absence or presence of a genuine dispute." FED. R. CIV. P. 56(c)(1)(A), (B). The nonmoving party cannot simply rest on "mere allegations or denials." *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001) (quoting FED. R. CIV. P. 56(e)). In assessing the parties' arguments, the "court must view the facts in the light most favorable to the nonmoving party and draw all

inferences in that party's favor." *Sovereign Bank*, 533 F.3d at 171 (3d Cir. 2008) (quoting *Saldana*, 260 F.3d at 232). In addition, the court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).[4]

Here, the parties' motions present a mixed question of law and fact, whether the Board's decision was supported by substantial evidence as required by the TCA and Pennsylvania law. In addition, the court must identify whether the Board abused its discretion or committed errors of law. These questions are properly before this court.

## IV. DISCUSSION

### A. The Telecommunications Act

The TCA was enacted "to provide a pro competitive de-regulatory national policy framework designed to accelerate rapidly private-sector deployment of advanced telecommunications and information technologies and services to all Americans by opening all telecommunications markets to competition." *Omnipoint Corp. v. Zoning Hearing Bd. of Pine Grove Twp.*, 181 F.3d 403, 406–407 (3d Cir. 1999) (quoting H.R. Conf. Rep. No. 104-458, at

---

[4] "The standards governing the court's consideration of Federal Rule 56[] cross-motions are the same as those governing motions for summary judgment, although the court must construe the motions independently, viewing the evidence presented by each moving party in the light most favorable to the [nonmovant]." *Schiazza v. Zoning Hearing Bd. of Fairview Twp.*, 168 F. Supp. 2d 361, 365 (M.D. Pa. 2001).

113 (1996), reprinted in 1996 U.S.C.C.A.N. 124). The TCA "expressly preserved local zoning authority over the placement, construction[,] and modification of personal wireless service facilities." *Cellular Tel. Co. v. Zoning Bd. of Adjustment of Ho-Ho-Kus*, 197 F.3d 64, 68 (3d. Cir. 1999) (citing 47 U.S.C. §332(c)(7)(A)). The TCA does, however, place "several substantive and procedural limits upon that authority when it is exercised in relation in to personal wireless service facilities." *APT Pittsburgh Ltd. P'ship v. Penn Twp. Butler County of Pennsylvania*, 196 F.3d 469, 473 (3d Cir. 1999).

With respect to procedural protections, the TCA states that "[a]ny decision by a State or local government . . . to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." 47 U.S.C. §332(c)(7)(B)(iii). With respect to substantive protection, the TCA provides that "[t]he regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government . . . shall not unreasonably discriminate among providers of functionally equivalent services." §332(c)(7)(B)(i)(I). Horvath's TCA claims are premised on these two provisions.

Where a local government's final actions are inconsistent with the safeguards set forth in the TCA, "any person" who has been "adversely affected" by the final action may file a lawsuit in a court of competent jurisdiction. §332(c)(7)(B)(v). Courts within this circuit have allowed those who

construct and operate wireless telecommunications facilities to bring suit, even if they are not carriers or providers of wireless services. *See Global Tower, LLC v. Hamilton Twp.*, 897 F. Supp. 2d 237, 243 (M.D. Pa. 2012); *Liberty Towers, LLC v. Zoning Hearing Bd. of Lower Makefield*, 748 F. Supp. 2d 437, 439, 442 (E.D. Pa. 2010). The court agrees with these decisions. Thus, although not a provider of wireless services, Horvath may bring suit to enforce the provisions of the TCA. The Board's decision adversely affected Horvath, particularly the company's plan to lease the land to Limitless for wireless services.

i. Substantial Evidence

Horvath argues in its cross-motion that the Board's decision was not supported by substantial evidence in the written record. Horvath focuses on the secondary conclusion in the Board's written decision—the conclusion that the proposed tower could not meet the requirements under Section 803.3 of the Ordinance for special exceptions. Horvath contends that this decision was not supported based on the evidence presented at the hearings and also contends the Board made a legal error and improperly placed the burden of showing the impact on the community on the applicant, instead of the objectors.

The Board does not dispute the allegation regarding the alleged error of law and instead focuses on the Board's first finding that the tower was not

similar to any use allowed in the R-1 District. The Board contends that this primary finding was supported by substantial evidence in the record and contends that this is enough to comply with the TCA. The court agrees that the Board's primary finding was supported by substantial evidence and this is enough to meet the requirements of the TCA.

"In order to determine whether a locality's denial was supported by substantial evidence . . . courts must be able to identify the reason or reasons why the locality denied the application." *T-Mobile South, LLC v. City of Roswell*, 135 S. Ct. 808, 814 (2015). The term "substantial evidence" is a term of art and should be construed in accordance with the traditional standard used in other areas of administrative law. *See id.*; *Omnipoint Commc'ns Enter., L.P. v. Zoning Hearing Bd. of Easttown Twp.*, 248 F.3d 101, 106 (3d Cir. 2001).

> [Substantial evidence] "does not mean a large or considerable amount of evidence, 'but rather such evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S. Ct. 2541, 101 L. Ed. 2d 490 (1988)(quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 156 (1938)). A court reviewing under the substantial evidence standard "is not to weigh the evidence contained in that record or substitute its own conclusions for those of the fact finder," but rather is to "determine whether there is substantial evidence in the record as a whole to support the challenged decision." *AT&T Wireless v. Zoning Board of the Adjustment of the Borough of Ho-Ho-Kus*, 197 F.3d 64, 71 (3d Cir. 1999).

*Omnipoint Commc'ns*, 248 F.3d at 106 ; *see also Ogden Fire Co. 1 v. Upper Chichester Twp.*, 504 F.3d 370, 379 (3d Cir. 2007). It requires more than a scintilla of evidence but less than a preponderance. *Global Tower*, 897 F. Supp. 2d at 251. In addition, where there is conflicting evidence, "the fact-finder must adequately explain its reasons for rejecting or discrediting competent evidence." *Id.* (quoting *Cellular*, 197 F.3d at 71).

Here, the Board's decision to deny Horvath's application was supported by substantial evidence. The Board's finding that Horvath's proposed tower was not similar to uses listed under Section 403 of the Ordinance is supported by the written record and the Board's written reasoning. The Board's placement of the burden on Horvath to show the tower met the requirements of the special exception under Section 509 was correct under Pennsylvania law. Whether their secondary conclusion was supported and legally sound only becomes an issue if their primary finding was unsound, which is was not.

"[A] special exception in a zoning ordinance is a use which is expressly permitted in a given zone so long as certain conditions detailed in the ordinance are found to exist." *Broussard v. Zoning Bd. of Adjustment of Pittsburgh*, 907 A.2d 494, 499 (Pa. 2006). The rules that govern the grant or refusal of a special exception are governed by the ordinance itself. Id. It is not really an exception, but "a use permitted conditionally, the application for which is to be granted or denied by the zoning hearing board pursuant to express standards and criteria." *Odgen*, 504 F.3d at 382 (quoting *In re*

*Brickstone Realty Corp.*, 789 A.2d 333, 340 (Pa. Commw. Ct. 2001)). An explicit special exception in an ordinance has already been designated to be appropriate for the particular zoning district and is "presumptively consistent with the public health, safety and welfare" of the residents in that district. *JoJo Oil Co., Inc. v. Dingman Twp. Zoning Hearing Bd.*, 77 A.3d 679, 686 (Pa. Commw. Ct. 2013); *see also id.* An applicant is entitled to this presumption once the applicant has established that the proposed use meets the requirements of the savings clause, including any "specific objective criteria" of the ordinance. *Id.* at 687.

"[It is impossible[, however,] for a legislative body to anticipate every conceivable use of land." *JoJo Oil*, 77 A.3d at 685–86(quoting *Cellco P'ship v. N. Annville Twp. Zoning Hearing Bd.,* 919 A.3d 430, 434 (Pa. Commw. Ct. 2007)). As such, town ordinances will often have what is referred to as a "savings clause," allowing a use when it is similar to some other allowed use in the ordinance. *Id.* at 685. Where the special exception is based on a savings clause, the applicant must meet the requirements of the savings clause and any specific objective criteria within the savings clause. *See id.* at 686, 688. After meeting this burden, the applicant is entitled to the presumption of appropriateness and it is then the burden of objectors to show that the proposed use does not meet "general, non-specific or non-objective requirements such as health and safety." *Id.* at 688. It is premature, however, to engage in an analysis of the subjective criteria used to grant special

exceptions, generally, if the applicant has not satisfied the criteria of the savings clause itself. *Id*. at 686.

Horvath's application was based on Section 509 of the Ordinance, a savings clause. Section 509 is titled "Uses Not Specified" and it allows a use in the township as a special exception "if similar uses are Permitted Uses or are allowed by Accessory Use, Conditional Use or Special Exception." (Doc. 18-2 at 20). The ordinance also has an explicit special exception analysis to be used whenever the Board is deciding whether or not to grant a special exception, located in Section 803.3. (Doc. 22-2, §803.3(e)). That only became relevant, however, if Horvath was able to show that the proposed tower met the objective criteria of Section 506—*i.e.*, that it was similar to some allowed use in the R-1 District.

Horvath's application was premised on the theory that the proposed 199 foot tower might qualify as a special exception because it was similar to the permitted use listed in Section 403.1(d). That section lists "[p]ublic uses, structures and buildings owned or operated by the Municipality or any Municipal Authority organized by the Municipality" as a permitted use in the R-1 District. (Doc. 18-2 at 17). In particular, Horvath analogized their proposed tower to a communication tower that might be used for emergency services or a cellular tower owned by a municipality and leased to wireless providers. (*See* Doc. 18-7 at 29).

In support of this theory, during the July 29, 2015 hearing, Ms. Baker, the site acquisition specialist, testified that the proposed tower would have a use that is similar to many municipalities that have towers either for their own communication services—for example, emergency services—or towers that are leased to cellular companies by the municipality. (*Id.*). Ms. Baker did not specifically indicate the details of these municipality owned or operated towers, but, over objections, testified that in her view the proposed tower fell within the parameters of Section 403.1(d). (*Id.* at 30–31). Part of her reasoning was based on the existing Service Electric tower near the proposed sight. (*Id.* at 31).

On cross-examination, Ms. Baker could not identify when the existing tower was put in place. (*Id.* at 35). She testified that she believed the existing tower was approximately 120 feet high. (*Id.*). She also testified that she had seen "towers everyday in residential neighborhoods." (*Id.* at 37). She did not provide any specific information regarding these municipality owned or operated towers, their physical dimensions, or their frequency in Pennsylvania or in Schuylkill County, specifically.

Next, Mr. Shelton, the radiofrequency engineer, testified that the proposed tower would be very similar in use to a municipality-owned tower, which he described as a public safety tower. (*Id.* at 73). He explained that the parts would be, essentially, the same as the proposed tower. (*Id.* at 73–74). On cross-examination, Mr. Shelton could not name a town in Schuylkill

County that had its own tower. (*Id*. at 74). He stated, generally, that there were "a lot of towers . . . attached to fire departments, very small towers," indicating that they were smaller than the proposed tower. (*Id*.). With respect to towers 200 feet in height, he explained that he would be able to discuss many sites in New Jersey of that height or taller. (*Id*. at 75).

At the August 26, 2015 hearing, Ms. Baker was recalled as a witness. At that time, she presented Applicant Exhibit 8 listing eighteen municipality owned wireless communication facilities in Pennsylvania. (Doc. 18-3 at 23–41; Doc. 18-8 at 20–21). She explained that many of the facilities on the list were built close to residential communities and that the list was meant to be illustrative of towers owned or operated by municipalities in Pennsylvania, not exhaustive. (Doc. 18-8 at 24–25). The exhibit contained street view and aerial photos of the existing towers, but these photos did not indicate how tall the towers were. The majority were located in Dauphin and Lancaster County, with one located in Berks County. (Doc. 18-3 at 23). On cross-examination, again, Ms. Baker could not name a municipality-owned tower in Schuylkill County, specifically. (Doc. 18-8 at 29). She also responded in the affirmative when asked whether or not Dauphin and Lancaster County were more populated, generally, than Schuylkill County. (*Id*. at 30). She admitted that her examples did not present examples of municipality-owned towers in small, rural communities. (*Id*.).

In its written decision, the Board concluded that Horvath's proposed use was not "similar or substantially similar to any allowed uses, building [sic] or structures of Butler Township." (Doc. 22-6 ¶13). The Board did not give any weight to Applicant Exhibit 8 listing municipality-owned towers in Dauphin, Lancaster, and Berks County for several reasons: (1) the list did not contain any towers within Schuylkill County or Butler Township; (2) the record lacked evidence about "key issues" such as whether the listed towers were near residential communities, the actual distance from the towers to residential structures, the corresponding zoning regulations for the listed towers, the zoning district they were in, and the heights of the listed towers; and (3) none of the towers appeared to be as high as the proposed tower. (*Id*. ¶11). The Board stated their reasoning as follows:

> While there may be municipally owned or operated facilities which are similar to privately owned or operated wireless facilities in terms of their design, structures and operation, including towers used for emergency or governmental communication purposes, elsewhere in Pennsylvania, none are known to exist or needed in Schuylkill County nor specifically in Butler Township as the record lacked such evidence; moreover, the record lacks evidence of many key issues about these other wireless communication towers for municipal or public use located elsewhere including as to when any such public or emergency (911) communication towers where erected vis-á-vis any surrounding residential structures nearby, the actual distances from the towers to the residential structures, what the corresponding zoning regulations allowed and what similar zoning districts they were erected in the respective locations, and the height of the other

> structures as none appear from the photographic images submitted as part of Applicant Exhibit 8 to be as large or high as the Applicant's proposed cell tower. There was no testimony that there are plans for any wireless communication towers to be utilized by the township for police or other municipal uses. Accordingly, the Board gives no evidentiary weight to Applicant Exhibit 8.

(*Id*. ¶11). Ultimately, the Board concluded that the proposed tower would not be allowed in the R-1 District, but it did conclude that the proposed tower might be allowed in the Light Industrial District. (*Id*. ¶15).

As stated in its findings of fact, the Board did not accept Ms. Baker's construction of the Ordinance, but did find Mr. Shelton's testimony to be credible. (*Id*. ¶¶19–20). The Board also determined that the existing Service Electric tower was "significantly shorter in height" than the proposed tower, was further away from residences, was "substantially obscured by foliage," and was likely built prior to the adoption of the Ordinance. (*Id*. ¶36). The Board concluded that the record lacked sufficient facts regarding the existing Service Electric tower's location and whether the existing tower was within Butler Township or along the township line. (*Id*.).

The Board's above, legal conclusions are supported by substantial evidence or, in this instance, the Board's written reasoning weighing the available evidence. The Board's factual conclusions are supported by the written record itself. It was Horvath's burden to show it met the similarity test listed in Section 509. There was conflicting evidence regarding whether or not

the proposed use was similar to the use allowed by Section 403.1(d). Applicant Exhibit 8 and the testimony of Ms. Baker and Mr. Shelton supported Horvath's position, but the testimony on cross-examination and the lack of details regarding municipality-owned towers supported denial. As the fact-finder with conflicting evidence, the Board was required to "adequately explain its reasons for rejecting or discrediting competent evidence," and it did so by giving specific reasons in its final conclusion. *Cellular*, 197 F.3d at 71. It is not this court's function to weigh the conflicting evidence a second time. *T-Mobile South*, 135 S. Ct. at 814.

The Board considered the list of municipality-owned towers proffered by Horvath, along with its accompanying photographs, and decided this exhibit was not entitled to any weight. The Board explained its reasons for doing so and the court cannot conclude that the Board's reasoning was clearly wrong, even when looking at contradictory evidence. The Board's written reasoning for rejecting Applicant Exhibit 8 included the fact that no municipality-owned towers were shown to be in Schuylkill County and the fact that there was no evidence in the record to indicate "key issues" including: (1) how tall the illustrative towers depicted in the exhibit were; (2) how near the facilities were to residential communities; and (3) the corresponding zoning districts and regulations. From the court's review of the underlying record, all of these findings are correct except the finding that the record lacked evidence regarding the actual distances of the towers in Applicant Exhibit 8 to

residential communities. It is obvious in the street view photos that the municipality-owned towers are near residential homes, though it is true that the actual distances are not represented. (*See, e.g.*, Doc. 18-3 at 25). It is less clear in the aerial photographs how far the municipality-owned tower depicted is to nearby residential homes. (*See, e.g.*, *id*. at 24). It is also true that the heights of the listed towers are not represented. It is also true that there is nothing to indicate that these towers were permitted under a provision similar to Section 403.1(d).

In its factual findings, the Board rejected "any proffered testimony by [Ms. Baker] concerning her interpretation of the zoning ordinances." (Doc. 22-6 ¶19). This rejection, necessarily, included her opinion that the proposed tower was similar to a municipality-owned tower. The Board's conclusion was based on the fact that the she was not a zoning expert and the Board also found her testimony to be only partially credible. (*Id*.). It was the Board's, and not Ms. Baker's, function to interpret the Ordinance. Thus, the Board's rejection of her legal interpretation was not incorrect. In addition, though Ms. Baker indicated that there were "tons of towers within [Schuylkill] county," (Doc. 18-8 at 25), on cross-examination Ms. Baker could not identify a single tower. The Board's decision to place less weight on this testimony was, thus, supported by the record.

The Board found Mr. Shelton's testimony to be credible and his opinions were generally accepted. (Doc. 22-6 ¶20). Mr. Shelton testified that the

proposed tower was functionally the same as municipality-owned towers, though he indicated that those within the county were, generally, much smaller. (Doc. 18-7 at 73–75). Like Ms. Baker, he also could not identify any municipality-owned tower in Schuylkill County to aid the Board's determination. (*Id*. at 74). The fact that Mr. Shelton's testimony did not sway the Board is, therefore, not surprising.

The fact that the Board focused on the proposed tower's physical features and not simply its functional parts does not run afoul of Pennsylvania law. "Deference is owed to a zoning board's understanding of its own ordinance." *Cellco*, 939 A.2d at 437 (citing *Broussard*, 907 A.2d at 500). Here, Horvath's application was premised on the theory that its proposed tower would be similar or substantially similar to a hypothetical municipality-owned tower that might be allowed under Section 403.1(d). In order to meet the similarity test, Horvath was required to show that their proposed tower was similar to a hypothetical tower Butler Township might own or operate and that the hypothetical tower would be allowed under Section 403.1(d) by the Board's interpretation of that section. The Board rejected this interpretation of Section 403.1(d) and Section 509 when construed together. The court cannot state that this finding was clearly wrong looking at the plain language of the Ordinance and the written record.

Lastly, the Board's secondary conclusions under Section 803.3 of the Ordinance is not dispositive because Horvath failed to meet its burden under

the objective criteria set forth in Section 509. *JoJo Oil*, 77 A.3d at 686. This secondary conclusion appears to have been a fail-safe in the event the Board's primary finding was incorrect. (*See* Doc. 22-6 ¶17 (stating that "[e]ven if the Applicant was able to carry its burden for a special exception in R-1, the Applicant has not adequately met its burden set forth in Section 803.3 for special exceptions.")). While the Board may have improperly placed the burden on Horvath to show it met the subjective criteria of Section 803.3, this evaluation would only be necessary where the Board's primary finding was in error. *See* *JoJo Oil*, 77 A.3d at 686. Because the Board's primary finding was supported by substantial evidence, the court need not reach Horvath's argument regarding Section 803.3. Accordingly, summary judgment will be entered in favor of the Board on Horvath's substantial evidence claim.

ii. Unreasonable Discrimination

The Board also argues that Horvath's unreasonable discrimination claim must fail because no second provider actually exists. Horvath did not respond to this argument in its brief or in its cross-motion, which is grounds alone for granting summary judgment in favor of the Board. Moreover, the court agrees with the Board and finds that this claim is not ripe for adjudication without an actual provider as a comparator.

The TCA provision barring unreasonable discrimination "seeks to ensure that, once the municipality allows the first wireless provider to enter,

the municipality will not unreasonably exclude subsequent providers who similarly wish to enter and create a competitive market in telecommunications services." *Nextel W. Corp. v. Unity Twp.*, 282 F.3d 257, 264 n. 6 (3d Cir. 2002). This provision requires an analysis under a two-prong test. *Id.* at 266. "[T]he first prong asks whether the providers are 'functionally equivalent.'" *Id.* (quoting 47 U.S.C. §332(c)(7)(B)(I)). This requires "showing that the other provider is similarly situated, i.e., that the 'structure, placement[,] or cumulative impact' of the existing facility makes them as or more intrusive than the proposed facility.'" *Id.* at 267 (quoting *APT Pittsburgh*, 196 F.3d at 480). "If they are [functionally equivalent], then the second prong asks whether the governmental body 'unreasonably discriminate[d] among providers.'" *Id.* at 266 (alteration in original). Some discrimination is permitted, but it cannot be unreasonable. *Id.* "Discrimination may be impermissible where a municipality favors one provider by permitting it to locate in a particular area at the exclusion of others, thereby creating an unfair competitive advantage." *Id.*

Both the first and second prong contemplate the existence of two providers, one that has been allegedly discriminated against and a comparator. Here, Horvath's theory is based on a hypothetical, Butler Township-owned provider that might be allowed under the explicit language of Section 403.1(d) of the Ordinance. No such provider actually exists. The court is not able to adjudicate in hypothetical terms. The court's judicial power

is limited to actual cases and controversies. U.S. CONST. art. III, §2, cl. 1. "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal citation omitted).

Here, there is no indication that Butler Township has or will erect its own tower, either for emergency services or to lease to providers of wireless services. Looking at the Board's written decision, there is no indication that the Board has actually interpreted Section 401.1(d) to allow such a tower. The fact that the Board sought information regarding the zoning districts and ordinances for the towers listed in Applicant Exhibit 8 suggests that the Board was not convinced that Section 401.1(d) encompassed such a tower. (Doc. 22-6 ¶11). The possibility of a Butler Township-owned wireless communication facility in the R-1 District is, at this stage, speculation.

Moreover, without an actual tower, the court cannot evaluate the two-prong test for unreasonable discrimination and engage in a meaningful analysis to determine if the providers are functionally equivalent and if the discrimination is unreasonable. The court cannot deal in hypothetical terms. Accordingly, Horvath's unreasonable discrimination claim is not ripe for adjudication and judgment will be entered in favor of the Board on this claim.

### B. The State Law Zoning Appeal

Summary judgment will also be granted in favor of the Board on Horvath's state law claim. The court will exercise supplemental jurisdiction

over this claim. *See* 28 U.S.C. §1367(a). A district court may decline to exercise supplemental jurisdiction over a claim if it has dismissed all claims over which it has original jurisdiction. §1367(c)(3). Moreover, "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court *must* decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (quoting *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995)) (emphasis in original).

Unusual circumstances are present here because the law governing Horvath's state law claim is nearly identical to Horvath's substantial evidence challenge under the TCA. Thus, the court has, effectively, decided the state law claim in deciding the TCA claim. *Cf*. *Growth Horizons, Inc. v. Delaware County*, 983 F.2d 1277, 1285 (3d Cir. 1993) (indicating that the district court should exercise supplemental jurisdiction where the court had heard all of the evidence necessary to reach the plaintiff's state law claim); *see also* *Schiazza v. Zoning Hearing Bd.*, 168 F. Supp. 2d 361, 374 (3d Cir. 2001). In the interest of judicial economy and convenience, the court will enter final judgment in favor of the Board on Horvath's state law claim, applying Pennsylvania law.

Where a court does not hear or take additional evidence, the decision of a local zoning board will be overturned only where the board committed an error of law or abused its discretion. *Hertzberg v. Zoning Bd. of Adjustment of Pittsburgh*, 721 A.2d 43, 46 (Pa. 1998). "An abuse of discretion will only be

found where the zoning board's findings are not supported by substantial evidence." *Id.* Similar to the standard under the TCA, substantial evidence in a state zoning appeal refers to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The court has also already concluded that the Board's primary finding was supported by substantial evidence. Thus, even if the Board committed an error of law in its secondary finding, its primary finding would still be sufficient to warrant denial of Horvath's application. Thus, any alleged error relating to the secondary finding is harmless. Accordingly, judgment will be entered in favor of the Board on Horvath's state law claim.

## V. CONCLUSION

The Board's motion for summary judgment, (Doc. 14), is **GRANTED** and Horvath's cross-motion for summary judgment, (Doc. 19), is **DENIED**. Judgment shall be entered in favor of the Board on all of the claims listed in Horvath's complaint, (Doc. 1). A separate order shall follow.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**DATED: March 29, 2017**

O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2016 MEMORANDA\16-0029-01.wpd